UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ROY J. BOLUS,

                              Petitioner,

v.                                              9:01-CV-1189
                                                (TJM/GHL)

L. A. PORTUONDO, Superintendent,

                              Respondent.

_____

APPEARANCES:                                OF COUNSEL:

OFFICE OF RUTH M. LIEBESMAN                  RUTH M. LIEBESMAN, ESQ.
*Attorney for Petitioner*
67 Wall Street
Suite 2200
New York, New York 10005

HON. ANDREW M. CUOMO                         STEVEN H. SCHWARTZ, ESQ.
Attorney General for the State of New York   Assistant Attorney General
*Attorney for Respondent*
State of New York
The Capitol
Albany, New York 12224-0341

GEORGE H. LOWE, United States Magistrate Judge

## REPORT AND RECOMMENDATION

### THE INITIAL *HABEAS* PETITION

On January 20, 1998, Roy Bolus ("Bolus" or "Petitioner") filed a *pro se* Petition under 28

U.S.C. § 2254 for a writ of *habeas corpus. Bolus v. Kuhlmann*, 98-CV-0094, Dkt. No. 1.  In that

proceeding Petitioner challenged his November 16, 1998, conviction in Albany County Court for

murder in the second degree (two counts), felony murder in the second degree (two counts),

robbery in the first degree (two counts), burglary in the first degree (two counts), criminal

possession of a weapon in the second degree, and attempted murder in the second degree.  He was sentenced to an indeterminate term of seventy-five years to life imprisonment.  *Id.*[1] Petitioner subsequently moved for dismissal of his petition without prejudice, so that he could exhaust state court remedies with respect to the alleged ineffective assistance of his appellate counsel.  *Bolus v. Kuhlmann*, 98-CV-0094, Dkt. No. 17.  His motion was granted on August 14, 2000.  *Bolus v. Kuhlmann*, 98-CV-0094, Dkt. Nos. 20 and 21.

## THE PENDING *HABEAS* PETITION

Petitioner, still appearing *pro se*, filed the instant Petition pursuant to 28 U.S.C. § 2254 on July 16, 2001.  Dkt. No. 1.[2]  Petitioner also filed a memorandum of law and an appendix in support of his petition.  Dkt. Nos. 2, 5.  On May 30, 2002, the Office of the Attorney General for the State of New York, on behalf of Respondent, filed a motion for summary judgment, claiming that the petition was untimely.  Dkt. No. 15.  On March 26, 2003, the Honorable Gary L. Sharpe, former United States Magistrate Judge, recommended that Respondent's motion for summary judgment be denied.  Dkt. No. 21.  In an Order filed on June 19, 2003, the Honorable Thomas J. McAvoy, United States District Judge, adopted Judge Sharpe's Report and Recommendation in its entirety and denied summary judgment.  Dkt. No. 26.  Thereafter Respondent filed a response and supporting memorandum of law on August 13, 2003  (Dkt. Nos. 28, 29), and Petitioner filed a traverse on September 29, 2003 (Dkt. No. 31).

---

[1]  The trial judge imposed a sentence of eighty years to life imprisonment, but the Appellate Division, Third Department, reduced the term of incarceration to seventy-five years to life.  *People v. Bolus*, 185 A.D.2d 1007, 1009 (3d Dep't 1992).

[2]  The Petition was stamped by the Clerk's office as having been filed in this Court on July 25, 2001.  Dkt. No. 1 at 1.  However, pursuant to the "prison mailbox rule," it is deemed filed on July 16, 2001.  Dkt. No. 21 at 5, n.4.

On May 24, 2004, Ruth M. Liebesman, Esq., filed her notice of appearance on behalf of Petitioner.  Dkt. No. 38.  Upon motion of Ms. Liebesman, this Court directed that Petitioner's *pro se* memorandum of law (Dkt. No. 2) be withdrawn, and granted her leave to file a substituted memorandum of law.  Dkt. No. 50.  This Court also granted Ms. Liebesman's request that Petitioner's Confrontation Clause claim be reinstated (this claim had been asserted in the petition (Dkt. No. 1), but was withdrawn by Petitioner while he was appearing *pro se* (Dkt. No. 31 at 8)). Dkt. No. 50.

Ms. Liebesman's substituted memorandum of law was filed on November 21, 2004.  Dkt. No. 53.  Respondent filed a responsive memorandum of law on December 10, 2004 (Dkt. No. 54), and Ms. Liebesman filed a "corrected" traverse on December 24, 2004.  Dkt. No. 56.

## SUMMARY OF FACTUAL BACKGROUND

According to Petitioner's Memorandum of Law, on March 9, 1988, two men were slain execution style at 57 First Street, Albany, New York.  Four men had forced their way into the house at that address, intending to rob George Mosely and William Patterson, two reputed drug dealers.  After taking clothing, cash and jewelry from Mosely, Patterson, and their girlfriends, Defendants Sessoms and Pugh purportedly forced the two men to lie face-down on the floor, where they were shot in the head by single rounds fired from an Uzi-type semi-automatic weapon.  These killings were witnessed by the girlfriends of the victims.  After the killings, Sessoms, Pugh and others fled south on the New York State Thruway.  Petitioner and his co-defendants subsequently were stopped by New York State Troopers on the Thruway near New Paltz, and were arrested.

At the trial Eric Smith testified that he was a cousin of George Mosely, and was visiting

at 57 First Street on March 9, 1988.  According to Smith, Petitioner, carrying a gun, was one of the four men who forced their way into the house.  Trial Tr. ("TT") at 1017-1046.

## DISCUSSION

Petitioner's claim for *habeas* relief is based upon the following four grounds:

1.      He was denied due process of law when the prosecutors failed to provide him with certain "Brady" materials.

2.      Admissions were elicited from him in violation of his "Miranda" rights.

3.      The receipt in evidence of redacted statements by four non-testifying co-defendants was a violation of his Sixth Amendment rights.

4.      He was denied the effective assistance of counsel, again in violation of his Sixth Amendment rights.

Dkt. No. 53 at I-ii.

## A.      Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant *habeas* relief to a state prisoner on a claim:

> that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> > 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2005); *see also Miranda v Bennett*, 322 F.3d 171, 177-8 (2d Cir. 2003); *Boyette v. LeFevre*, 246 F.3d 76, 88 (2d Cir. 2001).  The AEDPA also requires that in any such proceeding, "a determination of a factual issue made by a State court shall be presumed to be

correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1) (2005); *see also Boyette*, 246 F.3d at 88 (quoting 28 U.S.C. § 2254(e)(1)) (internal quotations omitted).

The Second Circuit has provided additional guidance concerning application of this test, noting that:

> Under AEDPA, we ask three questions to determine whether a federal court may grant habeas relief: (1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled?  (2) If so, was the state court's decision "contrary to" that established Supreme Court precedent?  (3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).  *See generally Lynn v. Bliden*, 443 F.3d 238 (2d Cir. 2006).

**B.     Petitioner's Claims**

**1.     The Alleged "Brady" Violation[3]**

It appears undisputed that three affidavits (two by Keith Horton and one by Lester Royal, (Dkt. No. 53, Exs. B, C, and D)), were not provided to Petitioner prior to trial.  As is acknowledged in Respondent's memorandum of law: ". . . the People did not reveal the statements to the Defense."  Dkt. No. 54 at 4.

---

[3]  In his memorandum of law, when discussing the alleged "Brady" violation, Petitioner refers to "prosecutorial misconduct due to the suppression of that exculpatory evidence and *the presentation of perjured testimony.*"  Dkt. No. 53 at 10 (emphasis added).  This Court cannot discern from Petitioner's papers in support of his *habeas* application any claim of prosecutorial "presentation of perjured testimony" outside the context of the "Brady" issue.  This reading of Petitioner's *habeas* claim is confirmed in his traverse, where he argues that he "was unaware of the perjury until he learned of the [Horton and Royal] affidavits at issue herein."  Dkt. No. 56 at 4.  In other words, Petitioner's claim of prosecutorial "presentation of perjured testimony" is founded on his arguments as to the import of the Horton and Royal statements.  Since I reject his arguments in this regard, as discussed below, there is no "presentation of perjured testimony" claim to address.

On November 30, 2000, promptly after being provided with the Horton and Ryan affidavits, Petitioner moved, pursuant to New York Criminal Procedure Law § 440.10, for vacation of his judgment of conviction as a result of the alleged Brady violation.  (Respondent's Answer indicates that these motion papers "could not be located."  Dkt. No. 28 ¶ 26).  The motion was denied by County Court on April 25, 2001, on a procedural ground but also on the merits.  Dkt. No. 28, Ex. 27.  The Court examined the statements of Horton and Royal, and found that they "are not Brady material and no Constitutional error has occurred."  *Id.* at 3.  The Appellate Division, Third Department, denied leave to appeal on July 9, 2001.  Dkt. No. 28, Ex. 28.

### a.    Clearly Established Supreme Court Precedent

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held "that the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  This rule as announced in *Brady* is clearly established.  *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001).

### b.    AEDPA Deference

As noted above, County Court denied Petitioner's § 440.10 motion on a procedural ground but also on the merits, finding that the Horton and Royal statements "are not *Brady* material and no Constitutional error has occurred."  Dkt. No. 28, Ex. 27 at 3.  Since the County Court adjudicated the *Brady* claim on the merits, this Court must give deference to that determination.  *Hines v. Miller*, 318 F.3d 157, 160-61 (2d Cir. 2003).

### c.    Contrary to, or Unreasonable Application of, Relevant Supreme Court Precedent

Relief sought by a *habeas* petitioner may be granted under the AEDPA "contrary to" clause under two circumstances.  The first is if the state court has actually applied the incorrect legal standard or rule.  The second set of circumstances under the "contrary to" clause is when the state court decision addressed facts that are "materially indistinguishable" from a relevant Supreme Court case, and yet the state court arrived at a decision in conflict with the holding of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 404-06 (2000).  With respect to the "unreasonable application" clause, *habeas* relief may be granted where the state court has either correctly identified the Supreme Court's rule, but unreasonably applied that rule to the facts, or where the state court unreasonably extends the Supreme Court precedent and applies it in a context where it should not apply, or, in the converse, unreasonably fails to apply the principle from the rule of the Supreme Court case where it should apply.  *See generally Carson v. Fisher*, 421 F.3d 83, 88-89 (2d Cir. 2005).

Here it is undisputed that County Court applied the correct legal standard, *i.e.*, the *Brady* principle.  In addition, *Brady* is not "materially indistinguishable" from the instant case.  The issue, therefore, is whether County Court "unreasonably applied" *Brady* to the facts before it.  As stated in *Smith v. Hollins*, 448 F.3d 533, 538 (2d Cir. 2006):

> Under this standard, "a federal court may not issue the writ simply because that court concludes on its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  *Id.* at 411.  "Some increment of incorrectness beyond error is required." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).  "[H]owever...the increment need not be great; otherwise, habeas relief  would be limited to state court decisions so far off the mark as to suggest judicial incompetence."

*Id.* (internal quotations omitted.)

**(I)     The County Court's Determination That the Safe Was
           Removed after the Murders Were Committed**

Petitioner first disputes County Court's determination that "[i]n the statements Horton and Royal detail their involvement in removing a safe containing drugs and money from the apartment where the murders occurred *after the murders were committed.*"  Dkt. No. 28, Ex. 27 at 3 (emphasis added).  Petitioner claims that this is "an erroneous reading of the affidavits." Dkt. No. 53 at 6.

As noted above, the AEDPA requires that "a determination of a factual issue made by a state court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254 (e)(1).  In his traverse Petitioner argues, and I accept, that there is no presumption of correctness "when the finding is erroneous on its face."  Dkt. No. 56 at 2.  Indeed if the finding were erroneous on its face that would constitute clear and convincing evidence rebutting the presumption.

However, the finding here is not erroneous on its face.  It is true, as Petitioner stresses in his traverse, that the affidavits do not state "that the safe was removed after the murders had occurred."  However, it also is true, again as Petitioner states in his traverse, that "[t]here is nothing in either affidavit that states when the safe was removed from the murder scene."  *Id.*  In other words, theoretically the safe could have been removed **prior to** the murders, **during** the murders, or **after** the murders.[4]

---

[4]  According to Royal's affidavit the safe was at Horton's house on March 9, 1988, after the murders.  Dkt. No. 53, Ex. D.  Nevertheless, there is nothing in his affidavit or those of Horton's that indicate when the safe was placed in Horton's house.

8

I find that County Court's reading of the statements, *i.e.*, that removal of the safe occurred <u>after</u> the murders, is not unreasonable.  Certainly Petitioner, who at best argues that the affidavits are silent as to specifically when the safe was removed, has not rebutted the presumption of correctness by even a preponderance of the evidence, much less the applicable standard of clear and convincing evidence.

> **(ii)     This Court's View That the Safe Might Have Been Removed Prior to the Murders**

It also would not be unreasonable, I find, to read the statements as meaning that the safe was removed from 57 First Street **prior** to the murders, by the murder victims, George Mosely and William Patterson.  In his second affidavit, Horton refers to a conversation he had with Mosely and Patterson following the police raid of a drug house at 19 Alexander Street, which occurred on March 1, 1988:

> I gave a statement earlier today and I forgot to mention that when the police raided the drug house on Alexander St. I had a con versation [sic] with George [Mosely] and William [Patterson] about the house being taken off.  **Curley [George Mosely] said that he was going to tell Chris who is their supplier that the safe [sic] they had on First St. was also taken off.**  I told them that they were crazy to tell Chris that.  I told them that Chris was the guy that was taken [sic] care of them and that they shouldn't rip him off.  They told me not to say anything if Chris called.  They said just tell him that the safe was taken by the police.
>
> About a day later Chris called me at my house and asked me what happened.  **I told him that the house on Alexander got busted and the house on first st. [sic] got busted.**  Chris wanted to know if the police got the safe and stuff that was in it.  By stuff I mean cocaine and a large amount of cash.  I don't know how much cash was in the safe but they did tell me at one time they had about $50000.00 and I always saw numerous ounces of cocaine.  Chris hung up and said ok.

Dkt. No. 53, Ex. C (emphasis added).  This suggests that the murder victims, in order to "rip off" their drug supplier, "Chris," removed the safe from 57 First Street **themselves, on some date between March 1 and March 8**.  (Consistent with this theory, Eric Smith testified at trial that he had seen a safe at 57 First Street prior to March 9, 1988, but he did not see it there on that date.  TT at 1039-1040.)

**(iii)     Petitioner's Argument**

The least plausible explanation as to when the safe was removed from 57 First Street would be during the murders (and this is the explanation upon which Petitioner's Brady argument is based, as will be discussed below).  There was no evidence at trial that at the time of the murders the killers, whomever they were, found and removed a safe.  Elizabeth Thompson (Mosely's girlfriend) and Eric Smith both testified as to what they observed the assailants doing, including their thefts of jewelry and clothes.  TT at 131-152 and 1025-1047.  No one testified that the murderers found and removed a safe, even though, as Petitioner points out, "it is clear from the testimony of Eric Smith that the assailants came in search of the safe."  Dkt. No. 53 at 7.  From this it is reasonable to infer that perhaps the most likely explanation as to the timing of the removal of the safe is **prior to** the murders, as part of the victims' efforts to "rip off" their drug supplier.[5]

As noted, Petitioner's *Brady* argument is based upon the claim that the safe was removed, by Horton, during the murders.  "That Horton was at the scene of the crime during the crime and

---

[5]  Based upon this reasoning I find as unpersuasive Petitioner's argument that failure to disclose Horton's statement precluded him "from cross-examining [Elizabeth] Thompson about how she knew that Horton was in possession of the safe, and when he had removed it from the premises."  Dkt. No. 53 at 6, n.2.

had taken physical evidence from the scene controverted the prosecution's theory of the case as presented at trial."  Dkt. No. 53 at 6, n.2.  Yet, as discussed, this argument is wholly speculative and not consistent with the evidence at trial.  Furthermore, even if the argument had any merit, it would not necessarily be exculpatory for Petitioner.  At best it would indicate that **one** of the four defendants was not present at the murder scene – but it sheds no light on which one.

### (iv)    Petitioner's Additional Arguments

Petitioner also argues that "Royal's affidavit averred that Keith Horton was at the scene of the crime, as he initially believed Horton to be one of the victims."  Dkt. No. 53 at 6, n.2 [6] Petitioner does not explain, and this Court cannot imagine, how a dead Keith Horton being on the scene could exculpate anyone but Horton.

Petitioner further argues (Dkt. No. 53 at 8) that the following statement in the Horton affidavit could have been used to impeach Eric Smith: "Monday March 14th or Tuesday March 15th Shorty [presumably Chris, the drug supplier for Mosely and Patterson [*see* Dkt. No. 53, Ex. B, where Horton states "Shorty who I also know as Chris"] called me and said that while he was at the wake for George [Mosely] both Beth [Elizabeth Thompson] and Bolo [Eric Smith] approached him and implied that he was somehow involved in the Murders and [sic] which point he left the wake and called Keith to find out who did it and why and I told him I didn't know."  Dkt. No. 53, Ex. B.

It is true that Eric Smith was the only eyewitness who placed Petitioner at the scene of the murders, and therefore impeachment evidence as against him might be considered to be

---

[6]  "Averred" does not accurately characterize Royal's statement: "[A]t first I thought my cousin [Horton] was one of the victims."  Dkt. No. 53, Ex. D.

"material"[7] in a *Brady* context.  *See Avellino*, 136 F.3d at 256-57.  Here, however, the statement

at issue is triple hearsay, it concerns an "implication" by Eric Smith that Shorty was "somehow

involved" (*e.g.*, not necessarily at the scene), and in its entirety it in fact suggests a *lack* of

involvement by Shorty (who "called [Horton] to find out who did it and why").

In *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005), the Second Circuit stated

that "[t]he government has a duty to disclose evidence favorable to the accused when it is

material to guilt or punishment."

> For *Brady* purposes, information is material "if there is a
> reasonable probability that, had the evidence been disclosed to the
> defense, the result of the proceeding would have been different."
> *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 94
> L.Ed.2d 40 (1987).  A "reasonable probability" is a probability
> "sufficient to undermine confidence in the outcome."

*Id.*  "The government has a so-called 'Brady obligation' only where non-disclosure of a particular

piece of evidence would deprive a defendant of a fair trial."  *United States v. Coppa*, 267 F.3d

132, 140 (2d Cir. 2001).

This Court is of the firm conviction that the Horton and Royal statements were not

material.  Petitioner's wholly speculative arguments, as discussed above, fall woefully short of

establishing a reasonable probability that had the statements been disclosed, the result at trial

would have been different.  Those arguments, which again are wholly speculative, do not cause

this Court to have any lack of confidence in the result.  Therefore, County Court's determination

that the statements were not *Brady* material, which determination is owed deference, was not an

---

[7]  "If the government has failed to disclose to the defendant evidence favorable to him, relief is
warranted only if the evidence was 'material.'"  *United States v. Avellino*, 136 F.3d 249, 256 (2d Cir.
1998).

unreasonable application of the *Brady* principle.  This Court recommends that, with respect to

Petitioner's *Brady* claim, the Petition be denied.

### 2.    The Alleged Miranda Violation

Petitioner asserts that "[d]uring the trial, it was established that Roy Bolus was questioned

three times by three different officers" (Dkt. No. 53 at 11), and that he was advised of his

"Miranda" rights only prior to the "third" interrogation.  This process of "question first" and then

provide "Miranda" warnings was rejected by the Supreme Court, Petitioner argues, in *Missouri v.

Seibert*, 542 U.S. 600 (2004).

The Appellate Division's decision addresses police questioning of Petitioner on **two**

occasions, not three:

> It appears from the testimony at the suppression hearing that
> defendant was arrested in Ulster County at approximately 11:00
> A.M. on March 9, 1988.  He was turned over to State Trooper
> Anthony Barrera for transport to State Police headquarters in
> Albany County.  When Barrera got into the troop car, he asked
> defendant his name and then inquired, without advising defendant
> of his *Miranda* rights, what happened, to which defendant replied
> "I guess I hung out with the wrong crowd".  There was no further
> conversation between Barrera and defendant during the one-hour
> drive to State Police headquarters.  It further appears that defendant
> slept during most of the trip.  When Barrera and defendant arrived
> at State Police headquarters, defendant was met by [Albany Police
> Detective] Keegan who advised him of his *Miranda* rights and
> asked him if he was willing to give a statement.  Defendant
> acknowledged his understanding of his rights and agreed to
> cooperate and give a statement.

*People v. Bolus*, 185 A.D.2d 1007, 1008 (3d Dep't 1992).

The alleged third questioning by an "unknown officer" is described in graphic detail in

Petitioner's affidavit dated November 30, 2004, (some sixteen years after it allegedly took place),

submitted as an attachment to his "Corrected Traverse" in this proceeding ("the unknown officer questioning").  Dkt. No. 56, Attach.  However, at the County Court suppression hearing, Petitioner's trial attorney addressed only two questionings, by State Trooper Barrera ("the Barrera questioning") and by Albany Police Detective Keegan ("the Keegan questioning").  Suppression Hr'g at 473-85.  He made no mention whatsoever of the unknown officer questioning, nor did the District Attorney (Suppression Hr'g ("SH") at 495-98), nor did the Court in its Decision (SH at 516-17).

Similarly on direct appeal to the Appellate Division, in "Appellant's Brief & Appendix," at Point V, Petitioner's appellate attorney addressed only the Barrera questioning and the Keegan questioning.  However, Petitioner himself submitted a *pro se* "Supplementary Brief for the Appellant" to the Appellate Division, and here he did reference an unknown officer questioning, at pages nine through eleven.[8]  This reference, however, was brief, and without any description of what occurred during the questioning.  It stands in stark contrast to the graphic description provided by Petitioner in his affidavit of November 30, 2004.[9]

---

[8]  This Court corresponded with counsel at some length concerning how and where Petitioner's claim concerning the unknown officer questioning was presented to the state courts.  Dkt. Nos. 59-65.

[9]  In his affidavit of November 30, 2004, Petitioner states:

> Immediately after the first round of questioning inside of the patrol car, another officer sat in the backseat with me and I had taken a quick nap during transportation to a police barracks.  I was awakened, and taken to an interrogation room handcuffed.  The handcuffs remained locked on my wrists as I waited alone in the interrogation room.  Shortly after, an officer whose name I do not know, entered and told me he had thirty minutes to get me to cooperate since I wouldn't cooperate during questioning in the patrol car.

> Without reading me my rights, once again, the officer commenced with a barrage of questions that I could not answer

14

regarding the commission of the crime for which I was detained.  When I did not give this unknown officer the answers he was looking for, he started looking at his watch, raising his voice and yelling at me.  The unknown officer stated that if I cooperated and stopped acting like an "ass-hole" maybe he could work something out with the district attorney and the judge and see to it that I walk away from the incident without going to jail.  When I told him again that I was not involved and didn't do anything, the officer walked over to me and said that he could and would hurt me in ways that my lawyer and the judge would never know about or be able to identify.  So it would be in my best interest to cooperate.  Again, I said that I wasn't involved in the incident.

The unknown officer grabbed my by my jacket, stood me up and punched me in the stomach.  When I bent over, the officer stretched his arm over and down my back, grabbed my wrists (Which [sic] were still secured in handcuffs) and pulled my arms upward.  I was forced to lean my face into his torso to prevent from falling forward.  I screamed and begged him to stop.  I kept telling him over and over that I didn't know anything, but he kept pulling my arms upward.  Excruciating pain shot back and forth across my shoulders and my upper back area.

The unknown officer let me go and I fell to my knees, crying.  The officer punched me in the back of my head and told me to "get the fuck up".  As I tried to stand up, the officer said since I was playing hard ball with him, he would connect me to the crime, even if I wasn't involved because somebody had to pay and I was the best candidate.  The officer asked me if I wanted to see how easy it was to get me involved and send me up the river for the rest of my life.  I told him no, I didn't want that.  He said well, I should of told him who shot who, and then left the room.

The officer left the interrogation room and returned with a clear small bag of jewelry and currency.  He spread the items on a desk in the interrogation room.  He told me that now I was connected to the crime because the items were those that were stolen from the scene of the crime.  That the items belonged to me now.  I remained silent in fear of another beating.

The unknown officer stated that if I didn't cooperate with the next officer who entered the room, he would come back and they would both beat me into a coma, and then pin more evidence against me so that my charges would be more serious.  Another officer, who I later learned was Detective Keegan, entered the room, as the unknown officer stood over the desk handling the stolen items on the desk and writing something on paper.

15

Following the Appellate Division's affirmance, Petitioner's appellate counsel sought

review from the Court of Appeals, based in part upon the *Miranda* claim, but again he made no

reference to the unknown officer questioning.  Letter from Colin J. Kenneally, Esq. to the Court

of Appeals (September 21, 1992).  Petitioner submitted a *pro se* letter to the Court of Appeals,

enclosing his *pro se* brief, but in the letter he did not address his *Miranda* claim at all nor did he

mention in any way the unknown officer questioning.  Letter from Roy J. Bolus to the Court of

Appeals (September 28, 1992).

### a.    Exhaustion

Prior to seeking federal *habeas* relief, a petitioner must exhaust available state remedies,

or demonstrate that there is either an absence of available state remedies or that such remedies

cannot adequately protect the petitioner's rights.  *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir.

2001) (quoting 28 U.S.C. § 2254(b)(1)); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994), *cert.*

*denied*, 515 U.S. 1118 (1995).  This exhaustion requirement is satisfied if the claim has been

---

The unknown officer spoke to Detective Keegan as he handled
the items, telling the Detective that I would cooperate fully and if I didn't
to let him know.  Then, the unknown officer stepped out of the room
again.  Immediately I told Detective Keegan that I didn't shoot anyone, I
didn't do anything and that I would cooperate fully if they didn't hurt me
again because my shoulders felt torn.

Dkt. No. 56, Attach.

In sharp contrast to the foregoing, Petitioner's "Supplementary Brief," dated December 31, 1991,
merely refers to an unknown officer who "had commenced to questioning the appellant inside the
interrogation room."  Supp. Brief at 9.  There is no reference whatsoever to the verbal and physical abuse
that is described in chilling detail in the affidavit.  Similarly, Petitioner's initial Memorandum of Law in
this proceeding is silent as to any verbal or physical abuse.  Dkt. No. 53 at 12.  This Court finds
Petitioner's affidavit of November 30, 2004, to be unworthy of any belief.

"fairly presented" to the state courts.  *See Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997)

(quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  A claim has been "fairly presented" if the

state courts are apprised of "both the factual and legal premises of the claim [the petitioner]

asserts in federal court."  *Daye v. Attorney General of New York*, 696 F.2d 186, 191 (2d Cir.

1982) (*en banc*); *Morales v. Miller*, 41 F. Supp. 2d 364, 374 (E.D.N.Y. 1999).  Finally, *habeas*

*corpus* petitioners bear the burden of demonstrating that they have exhausted available state

remedies.  *Cruz v. Artuz*, Civ. No. 97-2508, 2002 WL 1359386, at *8 (E.D.N.Y. June 24, 2002)

(citing *Colon v. Johnson*, 19 F. Supp. 2d 112, 119-20 (S.D.N.Y. 1998); *United States ex rel.*

*Cuomo v. Fay*, 257 F.2d 438, 442 (2d Cir. 1958)); *see also Ruine v. Walsh*, Civ. No. 00-3798,

2002 WL 1349713, at *2 (S.D.N.Y. June 19, 2002) (citing *Colon*, 19 F. Supp. 2d at 119-20)).

Here, to the extent that Petitioner's *Miranda* claim is based upon the unknown officer

questioning, as graphically described, for the first time, in his affidavit of November 30, 2004, it

obviously was not "fairly presented" to the state courts.[10]  Accordingly, this claim, as based upon

---

[10]  This arguably would be true even if the graphic description of that alleged interrogation had
been included in Petitioner's *pro se* "Supplementary Brief."  As stated in *Gleason v. Jenkins*, Civ. No. 05-
123-C, 2005 WL 2812253, at *8 (W.D.Wis. Oct. 27, 2005):

> Gleason attempts to show that he fairly presented all of his federal
> claims by pointing to the *pro se* supplement that he filed in the
> Wisconsin Supreme Court.  However, there is nothing in the record to
> suggest that the Wisconsin Supreme Court considered that document.
> Although the court apparently accepted the document for filing, it did
> not request the state to respond to it, did not refer to it in its order
> denying review, and gave no indication that it ever read or considered it.
> As the state points out, Gleason's supplement was an improper filing
> insofar as he was represented by counsel at the time.  Absent some
> indication that the court in some fashion considered this supplement
> document when passing on Gleason's petition for review, or that court
> rules allowed the filing of such a document, Gleason's supplement fails
> to establish that he fairly presented his claims to the state courts.

the unknown officer questioning, has not been exhausted.

### B.     Unexhausted Claims Which May Be Deemed Exhausted

When a claim has not been fairly presented to the state courts, a federal court may find that there is an absence of available state remedies "if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile." *Aparicio*, 269 F.3d at 90 (citing *Reyes v. Keane*, 118 F.2d 136, 139 (2d Cir. 1997)); *Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000), *cert. denied*, 532 U.S. 943 (2001).  Therefore, this Court must determine whether it would be futile for Petitioner now to present his *Miranda* claim, based upon the unknown officer questioning as described in the November 30, 2004, affidavit, to the state courts.

Since "New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal," *Aparicio*, 269 F.3d at 91 (citing N.Y. C.P.L. § 440.10(2)(c)), Petitioner could not now properly raise this claim in a motion to vacate his judgment of conviction pursuant to CPL § 440.10.  *See Aparicio*, 269 F.3d at 91; *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995). Therefore, this claim is "deemed exhausted" for purposes of Petitioner's *habeas* application. *Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 170 (2d Cir. 2000); *Senor v. Greiner*, Civ. No. 00-5673, 2002 WL 31102612, at *10 (E.D.N.Y. Sept. 18, 2002).  However, although these claims are "deemed exhausted," they also are procedurally barred.  *See Aparicio*, 269 F.3d at 90 (citing *Coleman v. Thompson*, 501 U.S. 711 at 735 n.1).

Federal courts may only consider the substance of procedurally barred claims where the petitioner can establish both cause for the procedural bar and prejudice, or alternatively, that a

fundamental miscarriage of justice would occur absent federal court review.  *See St. Helen v. Senkowski*, 374 F.3d at 184 ("[i]n the case of procedural default (including where an unexhausted claim no longer can proceed in state court), [federal courts] may reach the merits of the claim 'only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is actually innocent'") (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998)) (citations omitted); *see generally Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

To establish "cause," a petitioner must show that some objective external factor impeded his ability to either comply with the relevant procedural rule or fully exhaust his federal claims. *See Coleman*, 501 U.S. at 753; *Restrepo v. Kelly*, 178 F.3d 634, 638 (2d Cir. 1999); *Doleo v. Reynolds*, Civ. No. 00-7927, 2002 WL 922260, at *3 (S.D.N.Y. May 7, 2002).  Examples of external factors include interference by officials, ineffective assistance of counsel, or that "the factual or legal basis for a claim was not reasonably available" at trial or on direct appeal. *Murray*, 477 U.S. at 488 (citing *Reed v. Ross*, 468 U.S. 1, 16 (1984) and quoting *Brown v. Allen,* 344 U.S. 443, 486 (1953)).  *See also Bossett*, 41 F.3d at 829 (citing *Murray*, 477 U.S. at 488); *United States v. Helmsley*, 985 F.2d 1202, 1206 (2d Cir. 1992); *Lovacco v. Stinson*, Civ. No. 97-5307, 2004 WL 1373167, at *3 (E.D.N.Y. June 11, 2004) (citing *Murray*, 477 U.S. at 488).

Here Petitioner has not even asserted, in either his Petition or Corrected Traverse, a claim of cause for his failure to exhaust this claim.  As a result, this Court need not decide whether Petitioner suffered prejudice because, absent proof that the failure to consider the merits of the claims would result in a fundamental miscarriage of justice, federal *habeas* relief is unavailable as to procedurally barred claims unless **both** cause and prejudice are established.  *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *McLeod v. Moscicki*, Civ. No. 02-9335, 2003 WL

22427757, at *8 (S.D.N.Y. Oct. 22, 2003) (citing *Murray*, 477 U.S. at 494); *You v. Bennett*, Civ.

No. 00-7514, 2003 WL 21847008, at *7 (E.D.N.Y. July 29, 2003) (citing *Coleman*, 501 U.S. at

750); *Ayuso v. Artuz*, 2001 WL 246437, at *9 (S.D.N.Y. Mar. 7, 2001); *Pou v. Keane*, 977 F.

Supp. 577, 581 (N.D.N.Y. 1997) (Kahn, J.).

      Finally, this Court finds no basis to conclude that the denial of Petitioner's procedurally

barred claim would result in a fundamental miscarriage of justice, which exists "where a

constitutional violation has probably resulted in the conviction of one who is actually innocent."

*Murray*, 477 U.S. at 496.  "To establish actual innocence, petitioner must demonstrate that, in

light of all the evidence, it is more likely than not that no reasonable juror would have convicted

him." *Bousley*, 523 U.S. at 623 (internal quotation marks and citations omitted).  Furthermore,

"[i]t is important to note in this regard that 'actual innocence' means factual innocence, not mere

legal insufficiency." *Id.*

      In this proceeding Petitioner has not claimed actual innocence (*Bousley*, 523 U.S. at 623),

and there is no basis in the record for concluding that it is probable "that no reasonable juror

would have convicted him."

      Respondent has not argued that Petitioner's *Miranda* claim as based upon the unknown

officer questioning was procedurally barred because it was unexhausted.  This presumably is

because the Petitioner's affidavit of November 30, 2004, was attached to the Corrected Traverse,

to which the Respondent did not reply.  28 U.S.C. § 2254 specifically provides that "[a] state

shall not be deemed to have waived the exhaustion requirement or be estopped from reliance

upon the requirement unless the State, through counsel, expressly waives the requirement."  *See*

28 U.S.C. § 2254(b)(3); *see also Banks v. Dretke*, 540 U.S. 668, 674 (2004) ("AEDPA forbids a

finding that exhaustion has been waived absent an express waiver by the State") (citing 28 U.S.C.

§ 2254(b)(3)).  In the present action, Respondent has not expressly waived the exhaustion

requirement with respect to this claim.  Although a District Court can *sua sponte* raise a

petitioner's failure to exhaust as a basis for the denial of federal *habeas* relief, the federal court

must first afford the petitioner notice of the proposed disposition of the claim on procedural

grounds, as well as an opportunity to be heard on this issue.  *See Acosta v. Artuz*, 221 F.3d 117,

121 (2d Cir. 2000) (citing *United States v. Vincent*, 507 F.2d 1309, 1312 (2d Cir.1974)); *see also*

*King v. Mantello*, Civ. No. 98-7603, 2002 WL 32100251, at *15-16 & n.8. (E.D.N.Y.  Nov. 19,

2002) (Go, M.J.), *adopted*, *King v. Mantello*, Civ. No. 98-7603, 2003 WL 1873618 (E.D.N.Y.

Apr. 11, 2003).

      Since Petitioner has procedurally defaulted on this claim and has failed to establish either

cause for that default or that he is actually innocent, this Court recommends that this claim be

denied as procedurally barred.  If Petitioner believes that the claim should not be deemed

exhausted and procedurally barred, he must raise this contention in his timely-filed objections to

this Report and Recommendation.  *See Acosta*, 221 F.3d at 121.

### c.    Exhausted *Miranda* Claim

      In this *habeas* proceeding Petitioner's *Miranda* claim appears to hinge on the unknown

officer questioning, as discussed above.  For example, when the Respondent in his Memorandum

of Law addressed only the Barrera questioning and the Keegan questioning, Petitioner replied

that this "misses the point of the *Miranda* argument."  Dkt. No. 56 at 4.  Nevertheless, this Court

will address Petitioner's *Miranda* claim in the context of the Barrera questioning and the Keegan

questioning.[11]  This claim was exhausted, and Respondent does not argue to the contrary.

## I.  Clearly Established Supreme Court Precedent

Under *Miranda*, "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  In considering whether a party has voluntarily provided a statement to the police, courts are to consider the "totality of the circumstances."  *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993); *see also Colorado v. Spring*, 479 U.S. 564, 573 (1987).  Moreover, a coerced or otherwise involuntary statement may never be used for any purpose: "*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law . . . ."  *Mincey v. Arizona*. \$37 U.S. 385, 398 (1978) (emphasis in original).  *Miranda* obviously is a clearly established Supreme Court precedent.

## ii.  AEDPA Deference

The County Court held a suppression hearing on this issue (and others), and made findings of fact and law, as is discussed below.  The Appellate Division also explicitly addressed the issue, and similarly made findings of fact and law, also as is discussed below.  Clearly this

---

[11]  At trial the People did not offer into evidence Petitioner's responses to the Barrera questioning, and at the suppression hearing the prosecutor announced that he did not intend to do so.  SH at 496.  However, Petitioner called Trooper Barrera as a defense witness, and in response to Petitioner's counsel's questioning Barrera testified as to what Petitioner had said to him.  TT at 1442-1449.  Keegan did testify for the People at trial as to the oral and written statements that he had obtained from Petitioner.

Court must give deference to those determinations. *Cruz v. Miller*, 255 F.3d 77, 80 (2d Cir. 2001); *Youngblood v. Greiner*, No. 00 CIV. 7984, 2003 WL 21386251, at *7 (S.D.N.Y. June 16, 2003) (state court rulings on *Miranda* claims "must be afforded deference under AEDPA"); *Holland v. Donnelly*, 216 F. Supp. 2d 227, 237-39 (S.D.N.Y. 2002) (applying AEDPA's deferential standards to *Miranda* claim), *aff'd*, 324 F.3d 99 (2d Cir. 2003), *cert. denied*, 540 U.S. 834 (2003); *James v. Walker*, 99-CV-6160, 2003 WL 22052861, at *5 (E.D.N.Y. Aug. 28, 2003) (same).

### iii.    Contrary To, or Unreasonable Application Of, Supreme Court Precedent

As previously noted, County Court conducted a suppression hearing in order to ascertain whether Petitioner's responses to the Keegan questioning could properly be used against him at trial.  The Court found as follows:

> With respect to the defendant, Roy Bolus, the Court finds that at some time on March 9th, 1998, that he was interviewed by one Detective Richard Keegan, a detective with the Albany Police Department, who gave Mr. Bolus the Miranda warnings.  The Court finds these Miranda warnings were given fully and properly, that they were understood by the defendant, and that he waived his rights thereunder knowingly, intelligently and voluntarily, and thereafter gave oral and written statements.  It appears that when he was transported, when the defendant Bolus was transported from the New Paltz scene to the State Police barracks, that in fact he was asked several questions by one Trooper Barrera to the effect of "What happened?"  The only answer that was given by the defendant Bolus was that he got into the wrong crowd.  No admissions that he had done anything.  At a subsequent time, and not subject to any questions, he said that he would cooperate.  The Court finds that subsequently thereto that there was an attenuation of that initial taint by the said Trooper Barrera, and that with the giving of the Miranda warnings, that the defendant was advised fully as to what his rights were, and that his subsequent statements given were in no way produced and caused by the initial question

23

by Trooper Barrera.  Accordingly, the motion to suppress
statements made by the defendant, Roy Bolus, to the detective
Richard Keegan, both oral and written, is denied.

ST at 516-517.  On direct appeal the Appellate Division concluded that

defendant was not subjected to such continuous interrogation [by
Barrera] that the Miranda warnings administered thereafter can be
said to be insufficient to protect his rights.  The single question,
"What happened?", followed by a one-hour drive to the State
Police headquarters during which time defendant slept continually,
and the not insignificant fact that the subsequent questioning was
conducted by a different officer from a different law enforcement
agency, satisfies us that there was a definite and pronounced break
in the interrogation process such that defendant was no longer
under the influence of the initial questioning.

*People v. Bolus*, 185 A.D.2d at 1007 (citations omitted).

In light of the foregoing, this Court must recommend denial of Petitioner's *Miranda* claim

based upon the Barrera questioning and the Keegan questioning unless the State Courts'

determinations are either contrary to or represent an unreasonable application of the

aforementioned Supreme Court precedent.  They clearly are not, based upon my review of the

transcript of the suppression hearing, and Petitioner has not argued explicitly to the contrary

(since, as previously noted, his *Miranda* claim appears to hinge on the unknown officer

questioning).

In sum, the evidence before this Court establishes that Petitioner knowingly, voluntarily,

and intelligently waived his *Miranda* rights prior to the Keegan questioning.  He therefore has

not established that the Third Department's denial of this aspect of his appeal is contrary to, or an

unreasonable application of, *Miranda* and its progeny.  Accordingly, the Court recommends that

Petitioner's claim for relief based upon the Barrera questioning and the Keegan questioning (if

24

indeed he is making such a claim) be denied.

###   3.   The Alleged *Bruton* and *Crawford* Violation

At trial redacted statements by four of Petitioner's non-testifying co-defendants were received in evidence.  (Jean-Pierre, TT at 834; Riley-James, TT at 980-81; Pugh, TT at 1272-76; Chalk, TT at 1377-80).  Petitioner's name did not appear in any of these redacted statements. With respect to each statement the trial judge instructed the jury that the statement was being received only with respect to the defendant making it and that the jurors were not to consider the statement with respect to any other defendant.  TT at 832, 833,  835,  846, 979-80, 1265-66, 1373, 1387.[12]  In his final charge to the jury, the trial judge instructed as follows:

> Now, ladies and gentlemen, in these cases the People have offered in evidence certain written and/or oral statements claimed to have been made by respective defendants to the police with respect to the particular defendant's participation in the offense charged.  The People have submitted these in the belief that they should affect your verdicts.

> I charge you firstly [sic] that such statements may be considered by you, if you like, only in the case of the defendant making the statement.  It may not be considered in the cases of any other defendant.  The inferences to be made from the statement of any particular defendant, any fair inference from that statement may be utilized by you and considered by you solely in the case of that defendant making that statement and not in the case of any other defendant.

> Also, you have received what has been referred to as redacted statements, being only a portion of the original statement.  Do not speculate as to what else is contained in the original statements and draw no innuendo whatsoever from the fact that you have received only redacted statements.

---

   [12]  Petitioner's redacted statement also was received in evidence (TT at 922-25) and the trial judge gave a similar instruction.  TT at 917-18, 919-21.

TT at 1733-34.  Petitioner claims that the receipt in evidence of the non-testifying co-defendants' statements, the judge's instructions concerning those statements, and the prosecutor's reference to the statements in his summation, constituted a violation of his Sixth Amendment rights under the Confrontation Clause.

Petitioner raised these issues in his direct appeal to the Appellate Division (Appellant's Brief & Appendix, Points III and IV), and the People responded (Brief and Appendix for Respondent, at 11-16).  The Appellate Division affirmed Petitioner's conviction but did not explicitly address the Confrontation Clause claim.  *People v. Bolus*, 185 A.D.2d 1007, 587 N.Y.S.2d 486 (3d Dep't 1992).  Instead, that Court stated: "We have examined defendant's remaining arguments and find all but one [concerning the sentence imposed] to be meritless." *Id.* at 1009, 587 N.Y.S.2d at 448.  The New York Court of Appeals denied leave to appeal on January 5, 1993.  *People v. Bolus*, 81 N.Y.2d 785, 610 N.E.2d 404 (N.Y. 1993).

### a.    Clearly Established Supreme Court Precedent

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him."  In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that this Clause is violated when a non-testifying co-defendant's statement that inculpates the defendant is received in evidence.  The rule as announced in *Bruton* is clearly established.  *Ryan v. Miller*, 303 F.3d 231, 248 (2d Cir. 2002).

### b.    AEDPA Deference

As noted above, in affirming Petitioner's conviction the Appellate Division did not explicitly address his Confrontation Clause claim but said: "We have considered defendant's remaining arguments and find all but one [concerning the sentence imposed] to be meritless."

*People v. Bolus*, 185 A.D.2d at 1009, 581 N.Y.S.2d at 448.  This constitutes an "adjudication on the merits," and AEDPA deference applies.  *See Jimenez v. Walker*, 458 F.3d 130, 144 (2d Cir. 2006); *Hawkins v. Costello*, 460 F.3d 238, 242 (2d Cir. 2006).

### c.   Contrary to, or Unreasonable Application of, Relevant Supreme Court Precedent

Petitioner claims that the non-testifying co-defendants' "admitted statements repeatedly referred to we [sic], we re [sic], and our [sic], which clearly informed the jurors that the declarants were confirming that other persons were involved." *Id.* at 19.  Initially I note that simply "confirming that other persons were involved" did not necessarily implicate Petitioner and, in any event, the fact that other persons were involved was obvious to the jury from other evidence.  More significantly, statements redacted in this fashion have been found not to run afoul of *Bruton*:

> In addition, prior to *Gray*, this Circuit had already developed a body of law distinguishing  redacted statements that directly refer to a defendant from statements that are properly redacted so that they do not prejudice the defendant. For example, in *United States v. Tutino*, 883 F.2d 1125, 1135 (2d Cir. 1989), *cert. denied*, 493 U.S. 1081, 107 L.Ed.2d 1044, 110 S.Ct. 1139 (1990), we affirmed a conviction that was based, in part, on a statement of a co-defendant that was redacted so that it referred to "others," "other people," and "another person."  We stated that "a redacted statement in which the names of co-defendants are replaced with neutral pronouns, with no indication to the jury that the original statement contained actual names and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a defendant's *Bruton* rights." *Id.* Similarly, redacted statements have been upheld in *United States v. Alvarado*, 882 F.2d 645, 652-53 (2d Cir. 1989), *cert. denied*, 493 U.S. 1071, 107 L.Ed.2d 1021, 110 S.Ct. 1114 (1990); *United States v. Smith*, 918 F.2d 1032, 1038 (2d Cir. 1990); and *United States v. Williams*, 936 F.2d 698, 700 (2d Cir.), *cert. denied*, 498 U.S. 1125 (1991).

*United States v. Sanin*, 252 F.3d 79, 84-85 (2d Cir. 2001).

Second, Petitioner claims that the trial court's limiting instructions concerning the statements exacerbated, rather than ameliorated, the potential *Bruton* harm:

> Not only did the Court s [sic] instructions have the exact opposite affect [sic] as they are supposed to have - informing the jury that they could not consider the statements about other defendants (which they otherwise might not have assumed were implicated in the statements), they [sic] jurors were told that a legal technicality, the bane of law enforcement, was preventing them from considering against these co-defendants the facts that they [sic] declarants had implicated one another.

Dkt. No. 53 at 20-21. This statement is an inaccurate summary of the trial judge's instructions. In fact, the jury was told in essence that the statement of defendant "A" could only be considered in the case against him and could not be considered with respect to the case against any other defendant. TT at 832, 833, 835, 846, 917-18, 919-21, 979-80, 1265-66, 1373, 1387, 1733-34. Petitioner cites no law in support of his claim that such a charge was inaccurate, nor does he articulate what, in his view, the charge should have been. This Court finds that the trial judge's instructions were consistent with recommended instructions. *See* 1A Kevin F. O'Malley, Jay E. Grenig, & Hon. William C. Lee, Federal Jury Practice and Instructions (Criminal) § 14.04 (5th ed. 2006); 1-5 Hon. Leonard Sand, John S. Siffert, Walter P. Loughlin, Steven A. Reiss, & Nancy Batterman, Modern Federal Jury Instructions – Criminal § 5.07, Instr. 5-20 (2005).

With respect to Petitioner's "legal technicality" lament, such technicalities indeed may be the "bane of law enforcement," but this Court is aware of no legal authority, and Petitioner cites to none, that precludes a court from advising the jury explicitly of what is implied in all instructions, *i.e.*, that the Court is following the law.

Finally, Petitioner makes a confusing and non-specific argument that the prosecutor in his summation "intermeshed" the non-testifying co-defendants' statements, that he "overlapped" them, and that he "filled in the blanks" created by the redactions. Dkt. No. 53 at 21. Regrettably, beyond these generalizations that would apply to all of the defendants, Petitioner fails to point with *any* specificity to an impermissible statement by the prosecutor that pertains to him.

In *Ryan*, the Second Circuit stated that "it is well-established in this Circuit that lawyers may not circumvent the Confrontation Clause by introducing the same substantive testimony in a different form." *Ryan*, 303 F.3d at 248-49. Therefore, despite Petitioner's non-specific argument, this Court has carefully reviewed the prosecutor's entire summation. TT at 1628-1690. The prosecutor's discussion of the five statements appears primarily at pages 1660 through 1668 of the trial transcript. There the prosecutor's references to Petitioner are based upon Petitioner's *own* statement (TT at 922-25) and other evidence properly admitted against him. This was not a *Bruton* violation:

> There is an important distinction between this case and *Bruton*, which causes it to fall outside the narrow exception we have created. In *Bruton*, the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. *Id.*, at 124, n.1, 88 S.Ct., at 1621, n.1. Thus at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." *Id.*, at 135, 88 S.Ct., at 1627. By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony).

*Richardson v. Marsh*, 481 U.S. 200, 208 (1987). Even if the propriety of the prosecutor's summation was a closer question, this Court would recommend deferring to the Appellate Division's adjudication on the merits, particularly since "the line between testimony that falls

29

within *Bruton's* scope and that which does not is often difficult to discern." *United States v. Chen*, 393 F.3d 139, 149 (2d Cir. 2004).

In his submissions on this issue Petitioner cites five Supreme Court decisions (Dkt. Nos. 53 at 21 and 56 at 7), some without any discussion.  Only one is apposite to the issues in this proceeding, and that one decision, *Richardson v. Marsh, id.*, supports the state court's rulings, as noted above.[13]

With respect to the other four decisions, Petitioner refers to "interlocking confessions" and cites the Supreme Court's decision in *Cruz v. New York*, 481 U.S. 186 (1987).  Dkt. No. 53 at 21.  In *Cruz*, however, unlike the instant case, the non-testifying co-defendant's **unredacted** statement **explicitly identified and incriminated Cruz**.  It nevertheless was received in evidence because the co-defendant's statement and Cruz's statement interlocked, which, based upon the plurality opinion in *Parker v. Randolph*, 442 U.S. 62 (1979), arguably made *Bruton* inapplicable.  In *Cruz* the Supreme Court rejected the *Parker* plurality's rationale.  In short, *Cruz* is inapposite and a discussion about "interlocking confessions" is irrelevant.

Similarly inapposite is *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), where there was a Confrontation Clause violation based upon the trial court's denial of defense counsel's cross-examination designed to show bias on the part of a prosecution witness.  *Lilly v. Virginia*, 527 U.S. 116 (1999), involved the admission of a non-testifying accomplice's unredacted confession that inculpated Lilly.  Finally, in *Schneble v. Florida*, 405 U.S. 427 (1972), the Court held that even where there is a *Bruton* violation, automatic reversal of the conviction is not required, but

---

[13]  Petitioner purports to state what the Supreme Court "held" in *Richardson*.  Dkt. No. 53 at 21. But Petitioner's statement as to what the Court "held" is not even close to the *Richardson* holding.

rather the harmless error rule may be applicable.  In the instant case there was no *Bruton*

violation, and therefore harmless error analysis is unnecessary.

Much of Petitioner's argument on this claim is based upon the Supreme Court's 2004

decision in *Crawford v. Washington*, 541 U.S. 36 (2004), which "reconceived much of the

[Supreme] Court's Confrontation Clause jurisprudence."  *Mungo v. Duncan*, 393 F.3d 327, 329

(2d Cir. 2004).  In *Mungo* the Second Circuit held that "*Crawford* should not be applied

retroactively on collateral review."  *Mungo*, 393 F.3d at 336; *see also Howard v. Walker*, 406

F.3d 114, 123 (2d Cir. 2005).  Recently the Supreme Court reached the same conclusion.

*Whorton v. Bockting*, ___ U.S. ___, 127 S. Ct. 1173 (2007).  Therefore *Crawford* is inapplicable

to the analysis here.  Even if it were applicable this Court's conclusion would be the same, since

the Second Circuit "see[s] no indication that *Crawford* overrules *Richardson* or expands the

holding of *Bruton*."  *United States v. Chen*, 393 F.3d 139, 150 (2d Cir. 2004).  As the *Chen* court

explained:

> For *Crawford* to provide assistance to Chen and Liu, Tu's
> statements must have been admitted against them.  As discussed
> above, Tu's statements inculpate Chen and Liu only in the context
> of the substantial evidence used to link them to Tu's statements.
> The same attenuation of Tu's statements from Chen and Liu's guilt
> that prevents *Bruton* error also serves to prevent *Crawford* error.

*Chen*, 393 F.3d at 150.  Since this Court finds no *Bruton* error, there would be no *Crawford*

error, even if *Crawford* were applicable.

I find that the Appellate Division's adjudication of this issue on the merits, which

determination is owed deference, was not an unreasonable application of *Bruton*.

31

4.        **The Ineffective Assistance of Counsel Claim**

Petitioner claims that he was denied the effective assistance of counsel, in violation of his Sixth Amendment rights, because his trial attorney failed to object to the trial court's jury charge on "reasonable doubt."  Dkt. No. 1, Ground Two.  He raised an ineffective assistance of trial counsel claim in a state court motion pursuant to CPL 440.10 dated April 20, 1997, (Dkt. No. 28 ¶ 21) but he did not base that motion upon the claim asserted here, *i.e.*, trial counsel's failure to object to the "reasonable doubt" charge.  However, on April 30, 2000, Petitioner apparently filed, presumably with the Appellate Division, a *coram nobis* motion on the ground of ineffective assistance of counsel; according to Respondent's Answer, these motion papers cannot be located. Dkt. No. 28 ¶ 24.  The Appellate Division denied the motion on November 9, 2000, stating: "Upon the papers filed in support of the motion, and no papers having been filed in opposition thereto, it is ORDERED that the motion is denied."  Dkt. No. 28 ¶ 25.

a.        **Exhaustion**

Prior to seeking federal *habeas* relief, a petitioner must exhaust available state remedies, or demonstrate that there is either an absence of available state remedies or that such remedies cannot adequately protect petitioner's rights.  *Aparicio*, 269 F.3d at 89 (quoting 28 U.S.C. § 2254(b)(1));  *Ellman*, 42 F.3d at 147.  The exhaustion doctrine recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Daye*, 696 F.2d at 191.

In his Memorandum of Law Respondent "assumed that this claim was raised in the *coram nobis* motion."  Dkt. No. 54 at 14.  This Court is far from sure that this assumption is valid. Petitioner's claim in this *habeas* proceeding is that **<u>trial</u>** counsel was ineffective for not having

32

objected to the "reasonable doubt" charge.  Dkt. No. 1, Ground Two; Dkt. No. 53 at 24.  His

*coram nobis* motion presumably was directed at **appellate** counsel's failure to raise this issue on

appeal.  Indeed, Petitioner acknowledges this: "Appellate counsel s [sic] failure to raise this issue

on appeal was addressed by Roy Bolus [sic] Petition for Writ of Error Coram Nobis."  Dkt. No.

56 at 9, n.5.

 Nevertheless, this Court will assume *arguendo* that Respondent, by assuming that the

claim at issue was raised in the *coram nobis* motion (Dkt. No. 54 at 14), has waived the

exhaustion requirement.  28 U.S.C. § 2254(b)(3); *Banks*, 540 U.S. at 705-06.

   **b.**  **Clearly Established Supreme Court Precedent**

 In *Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006), the Second Circuit succinctly

addressed the applicable law for an ineffective assistance claim:

> An ineffective assistance claim asserted in a habeas petition is
> analyzed under the "unreasonable application" clause of AEDPA
> because it is "past question that the rule set forth in *Strickland*
> qualifies as clearly established federal law, as determined by the
> Supreme Court of the United States."  *Williams*, 529 U.S. at 391
> (internal quotation marks omitted); *Sellan*, 261 F.3d 110, 124 (2d
> Cir. 2003) (further citations omitted).

 *Strickland* established a two prong test to determine whether counsel has been ineffective.

*Strickland v. Washington*, 446 U.S. 668, 688 (1994).  As set forth in the test, a defendant must

prove that, 1) counsel's representation fell below an objective standard of reasonableness under

prevailing norms, and; 2) there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different.  *Id.* at 694; *see Wiggins v. Smith*,

539 U.S. 510 (2003); *Aparico*, 269 F.3d at 95; *see also Clark v. Stinson*, 214 F.3d 315, 321 (2d

Cir. 2000).

A criminal defendant has a high burden to establish the deficiency of his counsel.

According to the Second Circuit:

> "The court must . . . determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 U.S. S.Ct. 2052.  In gauging the deficiency, the court must be "highly deferential, must "consider [] all the circumstances," must make "every effort . . . to eliminate the distorting effects of hindsight," and must operate with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."

*Lindstadt v. Keane*, 239 F.3d 191, 198-99 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 688-89, 690) (alterations original to *Lindstadt*).

As for prejudice resulting from counsel's inadequate performance:

> "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052.  To merit habeas relief, "the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052.  The level of prejudice the defendant need demonstrate lies between prejudice that "had some conceivable effect" and prejudice that "more likely than not altered the outcome in the case." *Id.* 693, 104 S.Ct. 2052.  Thus "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.  The Court defined "reasonable probability" as one that "undermine[s] confidence in the outcome." *Id.*

*Lindstadt*, 239 F.3d at 204.

### c. AEDPA Deference

As noted above, in denying Petitioner's *coram nobis* motion the Appellate Division did not explicitly address his claims but said: "Upon the papers filed in support of the motion, and no

papers having been filed in opposition thereto, it is ORDERED that the motion is denied."  Dkt. No. 28 ¶ 25.  In *Sellan v. Kuhlman*, 261 F.3d 303 (2d Cir. 2001), the Second Circuit found that this language constituted an adjudication "on the merits" and therefore AEDPA deference was mandated.  *Sellan*, 261 F.3d at 308, 309-314.  However, there the Court reached that conclusion only after examining three "clues" to the basis of the state court decision, *i.e.*, (1) the face of the state court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances.  *Sellan*, 261 F.3d at 314.  The Second Circuit has instructed that these three "clues" must be examined when considering the basis of a state court's adjudication of a federal claim.  *Jiminez v. Walker*, 458 F.3d 130, 145 (2d Cir. 1006).

Here, of course, since the Petitioner's motion papers cannot be located, the People filed no opposition papers, and the state court opinion is not illuminating, these "clues" cannot be examined.  Therefore, this Court finds that no AEDPA deference is due.  Nevertheless, Petitioner's claim fails because, as is discussed below, the "reasonable doubt" charge was not erroneous.

### d.     The Charge

In the instant case Petitioner set up a "straw man" by asserting that the following was part of the trial court's "reasonable doubt" charge:

> . . . the inference of guilt should flow naturally from the facts proven and be consistent with them all.
>
> In other words, the inference of guilt must flow irresistibly from the facts proven and not be the result of strained or conjectural type reasoning.  The circumstances must be satisfactorily established and must be of such a character as, if true, <u>to exclude to a moral certainty every other hypothesis except that of the guilt of the accused</u>.

Dkt. No. 53 at 24 (emphasis in original).  Petitioner then proceeded to attack the use of "moral

certainty" in a reasonable doubt charge.  *Id.* at 24-25; Dkt. No. 56 at 9.

     The first problem with Petitioner's argument is that the language quoted above is from the

trial court's charge on circumstantial evidence, **not** on reasonable doubt.  TT at 1725-1726.  The

reasonable doubt charge is found at pages 1728 through 1729 of the trial transcript.  The second

problem is that Petitioner quotes only part of the reasonable doubt charge in his Memorandum of

Law (Dkt. No. 53 at 24).[14]

     The trial court's full charge on reasonable doubt was as follows:

               Now the expression reasonable doubt means just what the
          words imply.  It is a doubt based upon reason which arises out of
          the evidence or out of the lack of evidence in the case.  It is not an
          unreasonable doubt.  It is not a doubt based upon sympathy, whim
          or upon the reluctance of a juror to perform a disagreeable duty.
               It is a doubt for which there must be a reason, an honest
          doubt, one that leaves your mind in such a state of suspense or
          uncertainty that you cannot say that you are convinced of the guilt
          of the defendant whose case you are considering beyond a
          reasonable doubt.  If you have such a doubt, you must acquit the
          defendant.
               In considering the evidence, ladies and gentlemen, you will
          apply the same good judgment that you would apply in your own
          business or social relationships in your daily lives.  In [sic] you do
          this and you believe the defendant whose case you are considering
          guilty beyond a reasonable doubt, then you have been satisfied
          beyond a reasonable doubt and it is your duty to convict him.
               Now, do not get the impression, ladies and gentlemen, from
          what I have said that the People are required to prove the
          defendant's guilt to a mathematical certainty.  In courts of law,
          where cases rest upon human memory and human recollection and
          testimony, you cannot establish a defendant's guilt to a
          mathematical certainty or beyond all possible or conceivable doubt,

_____

     [14]  This Court is troubled that Petitioner erroneously referenced the circumstantial evidence
charge, and in addition quoted only part of the reasonable doubt charge.  I will assume, hesitatingly, that
this was inadvertent.

> and the People are not required to do so.  They are, however,
> required to prove guilt beyond a reasonable doubt.
>
> When a jury is convinced of a defendant's guilt beyond a
> reasonable doubt, then it is sufficient for a verdict of guilty.  If a
> juror has a reasonable doubt, he must vote to acquit the defendant.

TT. at 1728-1729.  The charge was not erroneous, and trial counsel clearly was not

constitutionally ineffective in failing to object to it.

Petitioner's substantive argument to the contrary is based almost exclusively on the

Supreme Court's decision in *Cage v. Louisiana*, 498 U.S. 39 (1990).[15]  There the trial court had

"equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt' and stated

that what was required was a 'moral certainty' that the defendant was guilty."  *Id.* at 41.  The

Supreme Court concluded:

> It is plain to us that the words "substantial" and "grave," as they are
> commonly understood, suggest a higher degree of doubt than is
> required for acquittal under the reasonable-doubt standard.  When
> those statements are then considered with the reference to "moral
> certainty," rather than evidentiary certainty, it becomes clear that a
> reasonable juror could have interpreted the instruction to allow a
> finding of guilt based on a degree of proof below that required by
> the Due Process Clause.

*Id.* at 41.  In the instant case, however, the trial court did not use the phrases "grave uncertainty"

or "actual substantial doubt," nor did he use the phrase "moral certainty" in his reasonable doubt

charge.  In short, *Cage* is inapposite, and trial counsel was not constitutionally ineffective by

failing to object.  This conclusion concerning trial counsel's representation is particularly

compelling since as of 1994 *Cage* was the **only** case in which the Supreme Court had "held that a

definition of reasonable doubt violated the Due Process Cause."  *Victor v. Nebraska*, 511 U.S. 1,

---

[15]  This Court need not address whether *Cage* is retroactive to cases on collateral review.  *See
Tyler v. Cain*, 533 U.S. 656 (2001) and *Gaines v. Kelly*, 202 F.3d 598 (2d Cir. 2000).

5 (1994).  Furthermore, the *Victor* opinion suggests that the charge in the instant case would not have been erroneous even if it **had** included the "moral certainty" phrase.  *Id.* at 16.[16]

      **WHEREFORE**, based upon the foregoing, it is hereby

      **RECOMMENDED**, that the petition for a writ of *habeas corpus* (Dkt. No. 1) be **DENIED** and **DISMISSED**.

      Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: April 12, 2007
     Syracuse, New York

George H. Lowe
United States Magistrate Judge

---

[16]  When Petitioner was appearing *pro se* he submitted to the Court what purports to be an "interview" in 2000 of one of the trial jurors, Josephine Blanchard.  It is one thing for a *pro se* litigant to file such a document.  This Court is astonished that counsel relies upon it.  Dkt. No. 56 at 9.